IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

William A. Taylor,                          :

     Plaintiff          :  Civil Action 2:08-cv-00190

  v.                              :  Judge Smith

True North Management,              :  Magistrate Judge Abel

     Defendant         :

# Opinion & Order

  Plaintiff William Taylor brings this action alleging that defendant True North Management breached a contract to pay him overtime and that he is entitled to unpaid overtime under Ohio Revised Code § 4111.03 and the Fair Labor Standards Act, 29 U.S.C. §§ 207, *et seq.* This matter is before the Court on True North's April 14, 2009 motion for summary judgment (Doc. 15).

## Summary of issues

  William Taylor worked as a filling station convenience store manager for True North from February 26 through September 17, 2007. Taylor negotiated a salary of $625 a week plus commissions. He regularly worked more than 40 hours a week and reported the hours he worked to True North. Initially his reports identified the hours worked in excess of 40 as overtime. After 6 or 7 weeks, he began to just report the total number of hours worked. True North never paid Taylor overtime. It has never paid any of its store managers overtime.

Plaintiff argues that True North contracted to pay him overtime, by making statements upon which he reasonably developed a belief that he had been promised it. Defendant responds that there is no evidence from which a finder of fact could conclude by a preponderance that there was a meeting of the minds that amounted to an agreement to pay overtime. As to the statutory claim for overtime pay, True North argues that Taylor's duties as a store manager exempted him from the requirement to pay overtime under the executive exemption to the Fair Labor Standards Act. Alternatively, True North argues that Taylor was an exempt administrative employee. In response, plaintiff argues that he was not paid on a salary basis, and that management was not his primary duty.

## Facts

The uncontroverted facts and, where controverted, the facts supporting plaintiff's claim for overtime are set out below. True North employed William Taylor to work as a store manager at its Store No. 608, Rome-Hilliard Road, Columbus, Ohio from February 26 through September 17, 2007. Taylor was given 2½ days of training for the position. (Taylor's February 25, 2009 Deposition, 24.) True North terminated Taylor's employment on September 27, 2007. (Dep. 167.) The grounds True North asserted for the termination are not relevant to the issues in this lawsuit. The complaint prays for $15,168.00 in damages, plus attorney fees and court costs on the statutory overtime claim and $7,854.00 plus court costs on the contractual overtime claim.

**Negotiated employment contract.**  In February 2007, Taylor sought a job with True North. (Dep. 40.) He was an experienced filling station convenience store manager. (Dep. 27-37.) Taylor negotiated with Paul Williams, the district manager, about location and salary. (Dep. 40-41.) Williams offered Taylor $600 a week in base salary. They negotiated and agreed to a base salary of $625 a week.  In addition, Taylor was entitled to a quarterly commission based on percentages of sales after certain thresholds were met.  (Dep. 42.)

**Overtime.**  Overtime was not mentioned during Taylor's negotiations with Williams. (Dep. 123.) Taylor testified that the first time the topic came up was at a February 27, 2007 meeting with Rick Reynolds and Mike Legens, during which Reynolds told Taylor that he was required to clock in and out. (Dep. 121.) Reynolds didn't say anything about overtime. (Dep. 122.) The next time overtime was mentioned was in May 2007. Taylor and Reynolds "were talking about the excessive hours that all of us had to put in," and Taylor said, "We are clocking in and out. Where is the overtime at? I haven't seen it on my check yet." (Dep. 122-23.) Reynolds responded that Taylor could bring overtime up with corporate, but that he wouldn't be employed very long if he did. Reynolds added that he was keeping track of his own time and hoped that Taylor was too. (Dep. 123.)  Taylor testified that a memo distributed at the May 23, 2007 store manager meeting, which said store managers were expected to work Monday through Friday from 6:00 a.m. to 3:00 p.m., suggested to him that he was an hourly employee.  (Dep. 124-25.) No one spoke at the meeting about overtime. (Dep. 126.) Later Taylor talked with Brad

3

Hayden about increased compensation and whether overtime would be rolled into his commission, and Hayden said he would get back to him. *Id.*

True North required store managers to clock in and clock out using a 1-800 number to connect with its UltiPro Time and Attendance system. (Kimberly Crippen's May 21, 2009 Affidavit, ¶ 4-5.) Taylor did not do so. *(Id.,* ¶ 8; Dep. 117-19). Instead Taylor kept track of his time on a computer and regularly forwarded it to True North's payroll department. (Dep. 116, 120.) Initially, when he reported his hours worked, Taylor broke them down between regular time and overtime. (Dep. 143-48.) But beginning June 4, 2007, he just reported the total number of hours he worked, and he did not break them down between regular hours and overtime. (Dep. 148-49, 151.) Taylor testified that he stopped separately reporting his overtime because he "never saw it reflected on my check." (Dep. 150.) He continued to break down time records for the employees he supervised between regular hours and overtime hours. (Dep. 146-47.) Taylor testified that he was always paid $625 a week with no overtime. (Dep. 142-43.) True North has never paid a store manager overtime for work as a store manager. (Crippen Aff., ¶ 9.)

**Job duties.** Taylor testified that he regularly performed the job duties set out on a two-page handout he signed and dated February 26, 2007 and a one page handout he signed March 19, 2007. (Dep. 78-87 and 92-95, Exhs. A and C.) The store manager responsibilities set out in these two forms include ensuring that every customer receives outstanding service; analyzing and following business trends and developing and implementing plans to maximize sales; controlling

4

shrinkage, expenses and payroll; ensuring adequate merchandise stock levels; ensuring that merchandise is faced and cleaned; establishing and enforcing procedures for receiving deliveries and processing returns from vendors; running daily reports from the electronic point of sales computer program and maintaining other required documentation; turning in a master sales report to include counting cash, preparing deposit slips and making daily bank deposits; annotating inside sales and gasoline audits; monitoring in-ground gasoline storage inventory; reviewing store trends and recommending initial changes to maximize goals and objectives; maintaining a competitive strategy with local competition; ensuring compliance with all policies and procedures through regular store management review; keeping employees informed of changes through meetings and/or an information book; reviewing audits, analyzing shrinkage by departments and taking initiatives to reduce shrinkage; continually evaluating and reacting to performance issues by using consistent and progressive discipline; actively recruiting customer service representatives candidates; and training and developing store employees in all aspects of the business. Taylor estimated that he spent 20-25 percent of his time doing paperwork and an additional 5 percent of his time doing managerial responsibilities. The remainder of his time was spent as a consumer service representative doing the same work as the employees he supervised. (Dep. 106-07.)

**Taylor's supervisors**.  Taylor's direct supervisor was Brad Hayden, the West Columbus territory manager. Paul Williams was the district manager. (Dep. 52.)

Either Hayden or Williams came into Taylor's store each day, staying for 30 minutes to 2 hours. They checked to "make sure that things [were] merchandised, schedules [were] posted, schedules [were] correct, computer work or computer caling[?] had been filed, paperwork [had] been completed, work assignments [had] been followed through." (Dep. 53.) Hayden supervised 11 stores. *Id.*

**Taylor's supervisees**. Taylor had 3-8 employees under his supervision. (Dep. 47.) He normally worked a shift with one other employee. There were two employees working with him perhaps 20 per cent of the time. (Dep. 47-48.)

**Hiring and firing**. Employee turnover at the store was 2-6 employees a month. Taylor recruited new employees by placing a placard advertising help wanted at the store, and was also sent applicants through the home office. (Dep. 55). About 70% of his employees were hired through the help wanted placard placed at the store. Taylor accepted applications at the store and forwarded them to Williams and Hayden for their review. Then Taylor would oversee the administration of a preemployment test to measure character and whether the applicant was a good candidate for the position. The test took 45 minutes to an hour. (Dep. 56-57.) An outside service graded the test. (Dep. 58.) If the score met at a minimum threshold, Williams would authorize Taylor to obtain a release from the applicant for a criminal background check. (Dep. 59, 65.) The results of the background check were available within 30 minutes of the request. If the applicant passed the criminal background check, then Taylor would hire the applicant and assign him a schedule. (Dep. 60-62.) Taylor would have the newly hired employee

6

complete the initial paperwork from a packet the company provided. (Dep. 68-69.) Taylor would provide the new employee with initial training. (Dep. 69.)

Taylor could recommend termination of an employee. He could send them home, telling them that they would be informed about their employment status within a given number of hours or the next day. (Dep. 74-75.) Taylor filled out and signed a termination form, then submitted it to Hayden or Williams. (Dep. 75-76.) Taylor recommended the termination of 6-8 employees a month. (Dep. 77-78.) His supervisors never failed to follow Taylor's recommendation that an employee be terminated. (Dep. 76-77.)

**Supervision and discipline**.  Taylor maintained the store employee work schedule. (Dep. 71.) The number of employee hours scheduled each shift remained about the same.  If there were adjustments, Taylor made them, sometimes with input from Hayden. (Dep. 72.) Employees came to Taylor for his approval if they wanted to switch hours. *Id.*

Taylor was responsible for employee discipline.  If an employee were tardy, Taylor would let them know that it was against company policy. He was responsible for writing up disciplinary actions.  Brad Hayden also wrote up disciplinary actions. Taylor and Hayden wrote up about the same number of disciplinary actions. (Dep. 70-71.)

**Stock, inventory and vendors**.  Taylor was responsible for inventory levels. He dealt with 6-8 vendors. (Dep. 73.)  Taylor did monthly overall inventory counts at the store. These took about 3 hours. (Dep. 157.) He did other counts during the

month that would take 15 minutes to an hour each. (Dep. 159.) He was required to

do 3 categories of inventories each week. (Dep. 160.) Taylor was required to perform

daily reconciliations which transmitted sales information to the office. (Dep. 88 and

164-65.) He was also responsible for daily shift report forms. (Dep. 90-91.) These

helped locate inventory shortages and overages. (Dep. 91.)


## Analysis

**Breach of contract.**  In his complaint, Plaintiff alleged:

> True North told store managers, including Mr. Taylor, that they would
> be paid overtime for the time they worked in excess of 40 hours per
> week.  These promises were made orally and in writing.  Store
> managers were instructed to keep careful track of the hours they
> worked as they would be paid on the basis of the number of hours
> actually worked.

(Doc. 1-2 at ¶4.)

Plaintiff stated that he was bringing a claim for breach of contract.  Under

Ohio law, a breach of contract occurs when a party demonstrates the existence of a

binding contract or agreement, the nonbreaching party performed its contractual

obligations, the other party failed to fulfil its contractual obligations without legal

excuse, and the nonbreaching party suffered damages as a result of the breach.

*Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108 (Ohio App. 1995).

Defendant points out, in his reply brief, that in opposing summary judgment

Plaintiff is now arguing a claim for promissory estoppel instead.  Modern notice

pleadings doctrine does not bar such a change in position.  *Knapp v. City of*

*Columbus*, 93 Fed.Appx. 718 (6th Cir. 2004). The Court will therefore consider Plaintiff's claim as one for promissory estoppel, rather than for breach of contract.

Plaintiff, in his memorandum contra, cites *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100 (1985) and *Kelly v. Georgia Pacific*, 46 Ohio St.3d 134 (1989) for the proposition that terms of employment such as pay may be created by express contract, implied contract, or through estoppel.[1] He alleges that he developed an "understanding that he was going to be paid for the time he worked in excess of forty hours in a week". (Doc. 16 at 4.) Plaintiff claims several bases for this understanding:

● On February 27, 2007, while Plaintiff was receiving his initial employment training from Rick Reynolds, another store manager, Reynolds advised him that he had a requirement to clock in and out using the company's automated telephone system and to keep time on the store computer and forward the records to the corporate payroll department. (Dep. 121-122.)

● In May 2007, Plaintiff engaged in a conversation with Reynolds complaining about excessive work hours. Plaintiff asked Reynolds about receiving overtime compensation, and Reynolds told him "[w]ell, you can bring it up with corporate or you can bring it up with the company. I don't know if you will be employed very long if you make an issue with it. [...] I'm keeping track of mine. I hope you are keeping track of yours." (Dep. 122-123.)

---

[1] It should be noted that both *Mers* and *Kelly* are cases involving suits for a breach of an implied contract of continued employment, not disputes over pay.

● Subsequent to this conversation, Plaintiff spoke to Brad Hayden, his territory manager, to ask whether overtime compensation would be included in his quarterly commission check. Hayden told him that he would get back to him on the issue. (Dep. 123-124.)

● On May 23, 2007, Plaintiff attended a managers' meeting. The agenda (Doc. 13-4 at 35) listed the following item:

> a. Working Hours – A managers working hours are Monday thru Friday 6:00am to 3:00pm. (or as long as it takes to get the job done!) If you're not at your store during those hours, your supervisor needs to know why.

● On August 23, 2007, Char Salmons, an employee at True North, sent an email to numerous store managers which stated:

> Reminder
> It is company policy that you clock in and out anytime you are working. Payroll schedule for the dates of 8/14/07 - 8/19/07 shows only 70 managers out of 114 using the clock in system! Please address immediately.

On the same day, Paul Williams, the district manager who supervised Plaintiff, sent a follow-up email to all Columbus store managers, which stated:

> Please make sure that you are clocking in and out. This has been a requirement for some time now. We will be paying according you [sic] according to your clocks so take care of your own paycheck.

(Doc. 13-4 at 39.)

Despite Plaintiff's representation in his complaint that True North "told" him that he would earn overtime, and promised this "orally and in writing", the record does not demonstrate, with the possible exception of Mr. Williams' email, any

statements by True North on the subject of overtime pay.  Plaintiff concedes as much in his memorandum contra, arguing instead that he reasonably interpreted the above facts at the time to mean that he was being promised overtime.

As the Ohio Supreme Court held in *Kelly, supra*:

> [T]he doctrine of promissory estoppel is applicable and binding to employment-at-will relationships when a promise which the employer should reasonably expect to induce action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise.  The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee.

*Kelly*, 46 Ohio St.3d at 139.  Plaintiff has not, however, presented any "representations" that True North ever made which mentioned overtime pay.  Plaintiff states that it is reasonable to interpret his employer's requirement that he be at his job during particular hours and that he track his presence at work to be an implied promise of overtime pay.  (Doc. 16 at 8.)  He denied at deposition ever before having had to keep specific hours in a salaried position.  (Dep. 125.)  This is at odds with the common experiences of salaried employees.  Many are required to be at their place of employment between the traditional hours of "9 to 5", or longer if the press of work should require.  Some, like Plaintiff, are apparently expected to be at their place of employment between the hours of "6:00am to 3:00pm.  (or as long as it takes to get the job done!)".  No reasonable finder of fact could deduce from True North's requirement that its managers be at their stores during a specific shift an

implied promise of overtime pay.[2]

Likewise, the email of Char Salmons and the comment of Rick Reynolds during training mentioning the company's requirement that its managers clock in and out cannot reasonably support a logical conclusion that True North thereby implicitly promised overtime pay to managers, rather than a conclusion that True North had an interest in ensuring that its managers were on the premises of the stores they managed or in determining the staffing requirements of its stores. Plaintiff's conversations with Reynolds and Hayden likewise lend no support to his contention. According to Plaintiff's testimony Reynolds (a fellow manager) apparently commiserated about the long hours of the job, but simply told Plaintiff that he could complain to corporate management for more pay if he wished. Hayden made no answer at all, let alone a statement supporting an implied promise, to Plaintiff's inquiry about overtime pay.

The email of Paul Williams is the only statement in evidence from a True North superior which addresses the question of whether pay might be linked to hours worked. On its face, his email could lead a reasonable finder of fact to an interpretation that True North store managers were paid according to the hours that they worked, or at least that they were in danger of having their pay docked if

---

[2] As addressed below, Plaintiff denies that he was a salaried employee. However, that an employer controls its employees' work schedules and does not permit them to come and go as they please does not mean that its employees are not salaried. *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 516 (6th Cir. 2004), citing 29 C.F.R. §541.118(a).

they failed to record all the hours they worked. However, Plaintiff has nowhere claimed that he made an "action or forbearance" in reliance upon Williams' statement, or that this reliance was to his detriment. Plaintiff did not take the job in reliance upon payment of overtime; Williams' August 23, 2007 email was sent several months after Plaintiff began his employment with True North, and Plaintiff in any case testified that he first began to believe that he was promised overtime *after* being hired. (Dep. 121.) Plaintiff has not claimed that he began to work additional hours after receiving the Williams email, or even that he changed his position in any way as a result of it. Instead, he testified that, by this point in his employment, he had ceased to record overtime separately, because it was not reflected on his paycheck. (Dep. 150.) No reasonable finder of fact could conclude that Plaintiff reasonably relied to his detriment on Williams' email.

Furthermore, Williams testified at deposition that he discussed the subject of pay before his hiring, and even specifically negotiated his pay rate:

A.    And then I negotiated with Paul Williams.

Q.    Okay. And then you were able to reach an agreement with him?
A.    Yes, on location and --
[...]
Q.    Okay. And did you guys talk about pay?
A.    Yes.

Q.    And what did he tell you about pay?
A.    That the base would be 600 a week.

Q.    Okay.
A.    And I believe we got the base to 625 a week.

Q.    Okay. So you negotiated it up to 625 a week?

13

A.    Right.

[...]
Q.    Did he talk to you about any other form of compensation?
A.    No.
[...]

Q.    Okay.  Were you then able to reach an understanding with Mr.
      Williams as to what the terms of your compensation would be?
A.    Terms of compensation?

Q.    Yes.
A.    As far as?

Q.    If you were to accept a position with them.
A.    Yes.

Q.    Okay.  And have you described those terms of compensation?
A.    Yes.

(Dep. 40-43.)  Plaintiff's allegations that various statements later caused him to

believe that he would be paid overtime cannot be reconciled with his deposition

testimony that he specifically negotiated his salary and benefits, and that he

understood the terms of his compensation when he was hired.

There is no genuine issue of material fact as to whether True North made

statements to Plaintiff which promised, or even mentioned, overtime pay.

Furthermore, there is no evidence upon which a reasonable finder of fact could

determine that Plaintiff relied to his detriment upon the only True North statement

which mentioned a link between hours reported and pay.  Plaintiff's claim that

Defendant is bound by an implied promise is therefore without merit.  Defendant is

entitled to summary judgment on Plaintiff's claim of promissory estoppel.

**Fair Labor Standards Act**.  Plaintiff has also brought a claim under O.R.C.

§4111.03, an Ohio statute requiring employers to pay overtime. This statute essentially incorporates by reference provisions of the Fair Labor Standards Act at 29 U.S.C. §207. Furthermore, the parties are in agreement that Plaintiff has brought a claim under the Fair Labor Standards Act as well. (Docs. 25, 26.) The claims are identical for purposes of this analysis. *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, n2 (6th Cir. 1997).

The Fair Labor Standards Act mandates that "no employer shall employ any of his employees [...] for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §207(a)(1). However, this requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity". 29 U.S.C. §213(a)(1). A "bona fide executive" is one (1) who is compensated "on a salary basis" at a rate of not less than $455 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more employees; and (4) who has the authority to hire or fire other employees or whose suggestions as to such are given particular weight. 29 C.F.R. §541.100.

Defendant argues that Plaintiff was a bona fide executive or administrative employee, and that he therefore is exempt from the requirement to pay overtime. Plaintiff rejoins that he was not paid on a salary basis and that his duties did not

15

fall into either the executive or administrative exemptions. The Court will examine these arguments individually. Defendant, as the employer, bears the burden of proving the elements of an exemption. *Renfro*, 370 F.3d at 515. The ultimate decision of whether an employee is exempt from overtime compensation is a question of law. *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 691 (6th Cir. 2001).

Plaintiff testified that, at the time of his hiring, he negotiated pay of "625 a week". (Dep. 42.) His paychecks reflected a gross pay rate of $1,250.00 every two weeks. (*See, e.g.*, Doc. 13-5 at 11.) Each indicated that he worked in each pay period 80.00 hours, and stated a "Pay Rate" of $15.625; neither his hours nor his pay rate varied. On its face, it appears that Plaintiff was paid on a salary basis.

Nevertheless, Plaintiff insists that he was not. 20 C.F.R. §541.602(a) states that an employee is considered to be paid on a "salary basis" if he received a set amount of pay which was "not subject to reduction because of variations in the quality or quantity of the work performed." This standard is met "if there is either an actual practice of making such deductions or an employment policy that creates a 'significant likelihood' of such deductions." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Plaintiff asserts that there is ample evidence that True North "was not going to pay him for forty hours if he ever worked fewer than forty hours." He points to the same evidence he used to support his claim of promissory estoppel – the company's requirement that he keep his time, that he keep to a set schedule, etc. As discussed above, the email of Paul Williams is the only communication from

Defendant which could plausibly support an assertion that employees like Plaintiff were in danger of having their pay reduced. However, as Plaintiff admits, there is no evidence that True North ever actually *did* reduce its store managers' pay based upon the hours they worked; he merely presents a hypothesis that it *might* do so at some point.

Plaintiff was paid the same amount week in and week out throughout the course of his employment. Although corporate policy required him to clock in, he almost never did so. Nevertheless, the amount of his paycheck was never affected by this failure. Whatever the basis for Mr. Williams' statement that "we will be paying according to your clocks", this was obviously not True North's policy, because the paychecks in evidence amply demonstrate that failing to clock in made no difference in pay. No reasonable finder of fact could conclude that there was a significant likelihood that Plaintiff's pay was subject to reduction based upon the quantity of his work, when the company made no real effort to track such quantity.[3] Plaintiff's argument that he was not a salaried employee is not credible.

Plaintiff next argues that he was not employed in a bona fide executive capacity. He states that it is beyond question that his primary duties were not those of management, because "Mr. Taylor spent around 25% of his entire work time doing anything that remotely fits into the category of managing. (5% of work time on supervisory duties, 20% of work time on paperwork duties)". (Doc. 16 at

---

[3] Char Salmons' email of August 23, 2007 (Doc. 13-4 at 39) complained that less than half of True North's managers were bothering to clock in.

12.)  Plaintiff avers that he spent the rest of his time in mundane operations tasks such as running the register and stocking shelves.

In *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496 (6th Cir. 2007), the plaintiff Thomas was a store manager for a retail gas station/convenience store chain similar to True North.  She was paid a base salary and potential commission bonus, similar to that of Plaintiff in this case, and worked long hours usually exceeding fifty per week.  After her termination, Thomas filed suit against the company for failure to pay overtime under the Fair Labor Standards Act and Ohio's overtime statute.  The defendant retailer argued in its defense that Thomas was a bona fide executive.

Thomas, like the Plaintiff here, argued that management was not her primary duty.  She stated that she spent approximately sixty percent of her time performing non-managerial tasks such as stocking shelves and sweeping floors.  *Id.* at 499.  Thomas testified, however, that her primary duty was to manage the store, and that she supervised, scheduled, and disciplined her employees.  *Id.*  The Sixth Circuit Court of Appeals found that Thomas' testimony that her primary duty was management was not itself dispositive, but that evaluating her actual job duties was required instead.[4]  *Id.* at 503.  In observing Thomas' responsibilities as store manager, the Court stated:

---

[4]  The *Thomas* court performed its precise analysis using a now-superseded version of the regulations defining the executive exemption.  *Thomas*, 506 F.3d at fn 5.

[W]e consider Thomas's non-managerial duties on the one hand, which include stocking merchandise, sweeping floors, and cleaning bathrooms. And, on the other hand, we consider Thomas's managerial duties, which include hiring employees, training employees, and assigning the weekly work schedule. If Thomas failed to perform her nonmanagerial duties, her Speedway station would still function, albeit much less effectively. After all, most of us – even if unwillingly – have visited and spent our money at filthy gas stations with sparsely stocked shelves. If, however, Thomas failed to perform her nonmanagerial duties, her Speedway station would not function at all because no one else would perform these essential tasks. Surely, a gas station cannot operate if it has not hired any employees, has not scheduled any employees to work, or has not trained its employees on rudimentary procedures such as operating the register. We therefore conclude that Thomas's managerial duties were much more important to Speedway's success than her non-managerial duties.

*Id.* at 505.

While not identical, the situation of the Plaintiff at bar is greatly similar. 29

C.F.R. §541.106(a) states that:

Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met. Whether an employee meets the requirements of §541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in §541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

The duties of the Plaintiff here were very similar to those of the Thomas

plaintiff. The factual summary above sets out in detail Plaintiff's job

responsibilities, such as dealing with vendors, performing daily sales reconciliations

and point of sale reports, making bank deposits, controlling shrinkage and expenses, reviewing audits, monitoring store inventory levels, and training employees.  He testified at deposition that these were his duties.  (Dep. 93-95.) Plaintiff also had responsibility over scheduling, disciplining, and terminating employees, as addressed below.

Plaintiff does not, in his memorandum contra, dispute any of this.  He simply argues that a reasonable factfinder "could, and almost certainly must, determine Mr. Taylor's primary duty was not managing the enterprise", because he claimed to spend only 25% of his time on managerial duties.  However, proportional usage of time is not itself dispositive:

> (a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work.  The term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

> (b)  The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  *Time alone, however, is not the sole test*, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time may nonetheless meet the primary duty requirement if the other factors support such a

conclusion.

> (c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. §541.700 (emphasis added). There is no genuine issue of material fact here as to whether Plaintiff bore the burden of managerial duties at his True North store. Managing the store was Plaintiff's most important responsibility, and clearly his primary duty.[5] Like the *Thomas* plaintiff, if he had not hired and scheduled employees, obtained more inventory, reported payroll, and prepared sales reports, no one would have. As §541.700(b) indicates, the fact that these duties took up no more than 25% of Plaintiff's actual working time does not diminish their importance, and does not diminish Plaintiff's management role.

The classification of an executive employee under 29 C.F.R. §541.100(a) also specifically states that such employee is one who "customarily and regularly directs the work of two or more employees" and "who has the authority to hire or fire other employees or whose suggestions and recommendation as to the hiring, firing, advancement, promotion or any other change of status of other employees are given

---

[5] The Court notes the factor of relative compensation in §541.700(a). During the same period, the next-highest-paid employee at Plaintiff's True North store earned about 56% of Plaintiff's gross salary. Doc. 15-3 at 3.

particular weight." Plaintiff does not specifically refute these requirements, except to state that it is "questionable" as to whether he met them. However, his deposition testimony demonstrates that he did. *See* 29 C.F.R. §541.104. Plaintiff testified that he had as many as eight employees under his supervision, and that he scheduled when they would work. (Dep. 47, 71-72.) While he typically worked personally with one or at most two other employees, Plaintiff delegated some responsibilities to an assistant manager. (Dep. 48-50.) He disciplined his employees whenever they were late or otherwise violated company policy. (Dep. 69-70.)

Plaintiff testified that hiring decisions in his company were generally done based upon a pre-employment test and then a criminal background examination. (Dep. 56-59.) He did not personally set company standards or recommend anyone for hiring; those who passed were hired. "If [the criminal background check] comes positive, then it's just a matter of when they are available to work, what times, what have you." (Dep. 61.) However, while Plaintiff did not himself possess the authority to terminate employees, his recommendations in this area were essentially unquestioned. Plaintiff testified that he could order an employee off the premises and submit a written termination form to the company for approval. (Dep. 75.) He terminated about three or four employees for disciplinary reasons, and as many as six to eight per month for absenteeism. (Dep. 77-78.) Although his territory or district manager was required to sign off on terminations, neither ever

rejected Plaintiff's recommendation.[6]  (Dep. 78.)

The Court therefore concludes that there is no genuine issue of material fact as to the scope and nature of compensation of Plaintiff's employment, and that he was, as a matter of law, employed in a bona fide executive capacity.  Pursuant to 29 U.S.C. §213(a)(1), Plaintiff was not entitled to receive overtime compensation under the Fair Labor Standards Act.  His claims under that statute and under O.R.C. §4111.03 must necessarily fail.

Because there are here no genuine issues of material fact, and because Defendant is entitled to judgment as matter of law on Plaintiff's claims of promissory estoppel and failure to pay overtime compensation, Defendant's motion for summary judgment (Doc. 15) is **GRANTED**.  The Clerk of Court is **ORDERED** to enter judgment in favor of Defendant on all claims, and to close this case.

s/Mark R. Abel           
United States Magistrate Judge

---

[6]  29 C.F.R. §541.105 states that "[t]o determine whether an employee's suggestions and recommendations are given 'particular weight', factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."